*1172 RILEY, Chief Judge,
concurring.
In my view, this case is more difficult than the court’s opinion reveals. While I concur in Judge Gruender’s opinion for the court and agree with the result, I feel compelled to add three observations.
A. Fourth Amendment
First, the court’s analysis of the suppression issue, though correct as far as it goes, is incomplete. I agree the district court did not clearly err in finding credible the police officers’ account of what transpired in Wright’s home on April 17, 2011. See ante at 1164-65, 1166-68. My problem is, that account establishes a clear-cut violation of Wright’s Fourth Amendment right “to be secure in [his] house[ ] ... against unreasonable searches.” U.S. Const, amend. IV.
Officers entered Wright’s home without a warrant not once, but twice. The first time, as the district court concluded, exigent circumstances justified the entry. I agree. Officers Thomas and Gray were responding to a burglar alarm, and when they arrived at Wright’s home there was good reason to think a criminal or victim was inside. See ante at 1164. They properly and constitutionally entered the home and conducted a protective sweep. See id. During that reasonable warrantless search, they smelled and saw marijuana. See id. Because the marijuana was in plain view, the officers could have seized it immediately without waiting for a warrant. See, e.g., Horton v. California, 496 U.S. 128, 135, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). Or, relying on what they had seen and smelled to provide probable cause, the officers could have exited the home and obtained a warrant. The officers decided to get a warrant. According to Officer Gray, once they finished their protective sweep and “knew nobody was in there, [they] exited the house and ... secured the scene so nobody could enter.” (Emphasis added).
The second time police officers entered, there was no justification for the warrant-less search. By the time the narcotics officers reached the scene, Wright’s home was “secured,” meaning “nobody could enter” or “disturb anything.” Neither exigent circumstances nor public safety any longer justified a warrantless entry, see Mincey v. Arizona, 437 U.S. 385, 392-93, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), and the officers — having assured themselves no one was inside — could not think there was any risk the marijuana might be destroyed, see Kentucky v. King, 563 U.S. -, -, 131 S.Ct. 1849, 1858, 179 L.Ed.2d 865 (2011). Yet Officer Gray reentered Wright’s home, and Investigator Neeley entered for the first time, without a warrant. See ante at 1164. Investigator Neeley “[w]alked in, saw there was marijuana,” then “said, ‘Yes, come back on out. We’re going to get a search warrant for the house.’ ” (Emphasis added). This second, warrantless entry was an obvious breach of the “firm line at the entrance to” Wright’s “house.” Payton v. New York, 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); see Mincey, 437 U.S. at 394, 98 S.Ct. 2408 (“declining] to hold that the seriousness of the offense under investigation itself creates exigent circumstances of the kind that under the Fourth Amendment justify a warrantless search”).
Nonetheless, Wright forfeited his right to relief for this Fourth Amendment viola *1173 tion because his counsel failed to raise the issue in the district court or even on appeal. See, e.g., United States v. Azure, 539 F.3d 904, 912 (8th Cir.2008). Notwithstanding this failure, our court has discretion to grant relief on plain error review if the violation “seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.” United States v. Olano, 507 U.S. 725, 736, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (internal quotation omitted); see Fed.R.Crim.P. 52(b). For example, in United States v. James, 353 F.3d 606 (8th Cir.2003), I joined Judge Richard S. Arnold’s opinion reversing a conviction because “[n]ot doing so would ... condone a stark violation of Fourth Amendment rights,” id. at 612 (emphasis added). Although the Fourth Amendment violation here cannot be condoned, I conclude a similar exercise of plain error discretion is not justified in this case.
The police ultimately collected the evidence used to convict Wright pursuant to a warrant. When police obtain a warrant based, in part or in whole, on information gleaned through an illegal search, the government may still use the evidence under the independent source doctrine if the government proves “both (1) that the decision to seek the warrant was independent of the unlawful entry — i.e., that police would have sought the warrant even if the [unlawful] entry had not occurred — and (2) that the information obtained through the unlawful entry did not affect the magistrate’s decision to issue the warrant.” United States v. Khabeer, 410 F.3d 477, 483 (8th Cir.2005). The district court did not consider whether the warrant would have issued despite the violation. Cf. Murray v. United States, 487 U.S. 533, 542 n. 3, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). Even if Wright had properly raised the issue, our court could do no more than remand for the district court to determine whether the government can meet its burden under Khabeer. Wright’s failure to raise the issue forecloses this avenue of relief. See, e.g., Yakus v. United States, 321 U.S. 414, 444, 64 S.Ct. 660, 88 L.Ed. 834 (1944) (“No procedural principle is more familiar ... than that a constitutional right may be forfeited ... by the failure to make ■ timely assertion of the right before a tribunal having jurisdiction to determine it.”).
B. Sixth Amendment
Second, the court’s resolution of Wright’s Confrontation Clause challenge is not free from doubt. While the court fairly reads the record to say Investigator Sexson’s out-of-court statements were not offered to prove the truth of the matter asserted, see ante at 1170-72, the court’s analysis is legalistic and, I fear, may not sufficiently account for how the jury likely perceived the testimony.
From the jury’s perspective, Investigator Sexson’s statement appeared to explain not only (1) why Investigator Brooks “had gone to the southeast bedroom,” ante at 1171, but also (2) when, where, and by whom the most critical piece of evidence in the entire case — the cocaine base for which Wright was on trial — was found. To jurors, Investigator Sexson’s statement, which was untested by cross-examination, was an important link in the cocaine base’s chain of custody.
The district court could have solved this problem by instructing the jury not to accept Investigator Sexson’s utterances as true, but instead the district court compounded the Confrontation Clause problem by admitting most of the affected evidence outside the jury’s presence. “[A]ny defect in the chain of custody goes more to its weight than its admissibility.” United States v. Briley, 319 F.3d 360, 363 (8th Cir.2003). By admitting this evidence outside the jury’s presence, the district court limited the jury’s opportunity to consider the effect of Investigator Sexson’s absence *1174 on the reliability of the chain of custody. When the jury returned, the district court informed the jury that the evidence related to Investigator Sexson was admitted into evidence, placing the court’s prestige behind the evidence and shielding the jury from important foundational details affecting the evidence’s probative value. It would have been better to introduce the evidence in the jury’s presence and instruct the jury that Investigator Sexson’s out-of-court statement was not evidence he actually “got something” — let alone the most important evidence in the entire case — in the southeast bedroom.
Despite this concern, I ultimately agree with the court that Wright’s Sixth Amendment claim does not merit relief.
C. Sufficiency of the Evidence
Third, I agree with the court’s rejection of the government’s argument that the fact Wright had a key to the home, by itself, proves he knowingly possessed the cocaine base found in the southeast bedroom. The government may think prosecutorial discretion is enough to prevent fathers from being imprisoned for marijuana hidden by their sons or to prevent wives from being jailed for their husbands’ secret caches of illegal guns or other contraband, but that is not the law. The government’s argument rests on a misreading of United States v. Brett, 872 F.2d 1365 (8th Cir. 1989), and is inconsistent with the views of our sister circuits, see, e.g., United States v. Tran, 519 F.3d 98, 105 (2d Cir.2008), and a long line of our cases stretching back to United States v. Wajda, 810 F.2d 754 (8th Cir.1987).
The government relies on a footnote in Brett, 872 F.2d at 1369 n. 3, “[b]ut no footnote is an island, entire of itself, and [this] statement in [a] footnote ... must be read in context.” Missouri v. Jenkins, 515 U.S. 70, 107, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995) (O’Connor, J., concurring). In context, the government’s reading of Brett is untenable. First, the Brett court relied on the defendant’s key only in the context of rejecting a challenge to the government’s proof of exclusive dominion and control — not knowledge. See Brett, 872 F.2d at 1368-69. The jury had a strong factual basis from which to infer the defendant’s guilty knowledge. As police approached the dwelling to execute their search warrant after completing an undercover purchase of drugs at the dwelling, the defendant fled through the back door and ran. See id. at 1367-68. Police later found him “hiding under a porch” several houses away with thousands of dollars. Id. at 1368-69. Upon arrest, he lied about his identity. See id. Because knowledge was not at issue, the Brett court’s reference to “the holder of the key” related only to what was at issue: whether the government had proved the defendant’s dominion and control over the contraband. “It is to the holdings of our cases, rather than their dicta, that we must attend.” Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 379, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994).
Also, we are not free to adopt the government’s isolated reading. See Mader v. United States, 654 F.3d 794, 800 (8th Cir. 2011) (en banc). Two years before Brett, we explained in Wajda that our “court has defined constructive possession as knowledge of presence plus control.” Wajda, 810 F.2d at 761 (emphasis added) (internal quotation omitted). “The location of [illegal] drugs in a portion of the house accessible equally to all the occupants raises the inference that any one or all of them possessed cocaine,” but “[without more ... would be insufficient to sustain their possession convictions.” Id. at 762. “[T]here must be some nexus linking the defendant to the drugs.” Id.
Following Wajda, we have stated unequivocally that the “[a]bility to control *1175 without knowledge of the object’s presence is not constructive possession.” United States v. Serrano-Lopez, 366 F.3d 628, 634 n. 5 (8th Cir.2004); see also, e.g., United States v. Lee, 356 F.3d 831, 837 (8th Cir. 2003); United States v. Lemon, 239 F.3d 968, 970 (8th Cir.2001); United States v. Johnson, 18 F.3d 641, 647 (8th Cir.1994).[4] Thus, in United States v. Pace; 922 F.2d 451 (8th Cir.1990), our court reversed the conviction of a defendant who held the key because “[t]he evidence d[id] not prove [the defendant] knew that he was helping carry cocaine across the country.” Id. at 453.
Contrary to the government’s contention, the critical question is not whether Wright had a key to the residence. Although certainly relevant, that key alone is insufficient to convict. See, e.g., Gaonar-Lopez, 408 F.3d at 505-06 (describing the defendant’s possession of the key as just one piece of the evidence pointing to guilt). Even if the jury did not believe Wright shared the home with two other roommates, there is undisputed evidence Wright was not necessarily the only “holder of the key” to the home: Hope Johnson, Wright’s then-girlfriend, also had the security code and frequently stayed in the home, including the night before police found the hidden cocaine base. See ante at 1165-66, 1168-69. The principal question is whether the government proved Wright knew there was cocaine base hidden in the southeast bedroom.
At trial, 'the government’s evidence of such knowledge was not strong. Although police found receipts, mail, and clothes in the northwest bedroom and linked them to Wright, the government made no apparent effort to link the more important clothes found in the southeast bedroom to Wrighb — even though the cocaine base was hidden inside a jacket. Did the jacket belong to Wright? Did it even fit Wright? The government provided no answer, arguing only that “what was discovered [in] the rest of the house” established Wright’s knowledge of the drugs in the southeast bedroom.
What was discovered in the rest of the house certainly provided compelling evidence of possession with intent to distribute marijuana and personal use of cocaine base, but as to distribution of cocaine base ' the evidence ' is more questionable. In Wright’s bedroom, police found almost 300 grams of marijuana, less than $10,000, and fewer than two grams of cocaine base. The cocaine base in the southeast bedroom, by contrast, was worth almost eight times as much as the cash found in Wright’s bedroom — not particularly consistent with the comparatively small amount of cash attributable to Wright. Given Wright’s involvement in marijuana distribution, the elaborate surveillance system[5] *1176 similarly does not indicate he knew there was cocaine base in the southeast bedroom. And the absence of evidence showing Wright actually distributed any cocaine base diminishes the strength of the government’s case. Cfi, e.g., Lee, 356 F.3d at 837.
Despite Wright’s reasonable arguments to the contrary, the government offered just enough evidence to sustain the jury’s verdict. According to the government’s laboratory report, both the large quantity of cocaine in the southeast bedroom and one of the two small quantities of cocaine in Wright’s northwest bedroom consisted of a mixture of cocaine base and levami-sole, a veterinary antiparasitic which is highly toxic to human beings.[6] Relying on this report, the jury reasonably could find the hidden cocaine stash was “the same mixture” as Wright’s personal cocaine stash, leading to a reasonable, if tenuous, inference Wright knew about the hidden cocaine. Ante at 1168-69.
To be sure, the laboratory report introduced by the government does not detail the proportional composition of the drugs. It is possible that further analysis might have revealed one sample contained a substantially greater proportion of levamisole than the other. In addition, the government’s own data reveal the overwhelming majority of cocaine in the United States contains levamisole.[7] Had Wright presented either proportional evidence or testimony about the ubiquity of levamisole in U.S. cocaine, it probably would be impossible for the jury to conclude — reasonably— that Wright’s personal cocaine stash contained precisely “the same mixture” as the distribution quantity in the southeast bedroom. But Wright presented no such evidence.
Given the “high hurdle” required to disturb a jury’s verdict and our “very strict standard of review,” Gaona-Lopez, 408 F.3d at 504 (internal quotation omitted), I join the court in affirming Wright’s conviction.

. On casual reading, some of our court’s post-Brett cases might appear inconsistent with Wajda, but a contextual reading of these cases’ cursory references to the Brett footnote demonstrate our court has never allowed the government to convict an individual for drugs he knew nothing about based solely upon his possession of a duplicated key. For example, in United States v. Gaona-Lopez, 408 F.3d 500 (8th Cir.2005), I wrote for the court that the defendant's “possession of the [storage] unit key and the [car] key [was] sufficient evidence to prove knowing possession of the [drugs] concealed inside,” id. at 505. But I did not stop there, going on to list a litany of reasons for the jury to disbelieve the defendant’s claim that he knew nothing about the illegal drugs. See id. at 505-06. Similarly, while United States v. Timlick, 481 F.3d 1080, 1083 (8th Cir.2007), quoted Brett for the general proposition that holding the key establishes constructive possession, the opinion only relied on the key to establish dominion or control and then separately addressed, in detail, the evidence establishing the defendant’s "knowledge” of the contraband. Id. at 1083-84.

. Wright also had a typical home security system. A professionally monitored security system, which will send police to the home if *1176 activated — not good news for a drug dealer— is little evidence of guilt.

. See, e.g., Drug Enforcement Agency, Office of Diversion Control, Levamisole (April 2013), available at http://www.deadiversion.usdoj. gov/drug_chem_info/levamisole.pdf; Kachiu C. Lee, et al., Complications Associated With Use of Levamisole-Contaminated Cocaine: An Emerging Public Health Challenge, 87 Mayo Clinic Proc. 581 (2012).

. See, e.g., Dep’t of Justice, Nat’l Drug Intelligence Ctr., National Drug Threat Assessment 2010 4 ("By 2009, approximately 71 percent of the tested cocaine samples contained le-vamisole.'').